# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| In re, | C/A No. 18-04406-HB |
| George Robert Walker and Sherry Denise Walker, | Adv. Pro. No. 18-80075-HB |
| Debtor(s). | Chapter 13 |
| George Robert Walker and Sherry Denise Walker, | **ORDER** |
| Plaintiff(s), | |
| v. | |
| UpRight Law, Law Solutions Chicago, LLC, Law Solutions Chicago LLC, | |
| Defendant(s). | |

**THIS MATTER** came before the Court for a trial on the Complaint filed by Plaintiffs George Robert Walker and Sherry Denise Walker against Defendants UpRight Law, Law Solutions Chicago, LLC, Law Solutions Chicago LLC (collectively, "Upright").[1] Testimony was provided by the Walkers, a representative of Set Financial, attorneys Herman F. "Rick" Richardson and Paul Owen, and Ryan Galloway on behalf of Upright. The only remaining issue is whether sanctions should be imposed pursuant to 11 U.S.C. § 105; all other matters were resolved prior to trial. The following findings of fact and conclusions of law are entered pursuant to Fed. R. Civ. P. 52.[2]

---

[1] After this adversary proceeding was filed, Upright changed ownership and is now Deighan Law, LLC d/b/a UpRight Law LLC in South Carolina.

[2] Made applicable to this adversary proceeding by Fed. R. Bankr. P. 7052.

# I. FACTS

## A. UPRIGHT'S PROCEDURES

1.      Upright is a national consumer bankruptcy law firm headquartered in Chicago, Illinois.  Upright conducts business in South Carolina utilizing affiliations with locally licensed attorneys.

2.      Ryan Galloway of Upright testified that since 2014, Upright has filed approximately 50,000 bankruptcy petitions nationwide.  His testimony was that of the approximate 11,400 petitions Upright filed in 2019, 865 were filed by residents of South Carolina.[3]

3.      Through online marketing, Upright connects with individuals to provide debt relief assistance.  This is done utilizing a main intake office in Chicago.  An individual who contacts Upright over the telephone speaks with a Senior Client Consultant ("SCC") who conducts the "initial consultation."  The SCC may or may not be an attorney.  There was no evidence that the SCC is ever an attorney licensed in South Carolina or admitted to practice before the federal courts of this state or this Court ("SC attorney").

4.      During the initial consultation, the SCC gathers general information regarding the individual's assets, debts, income, and motivating factors for contacting Upright to understand what assistance he seeks that Upright may be able to offer.  Initial consultations are advertised by Upright to be free of any charge.

5.      At the conclusion of the initial consultation, if the individual elects to proceed, the telephone call continues while Upright conducts its formal "intake process."  During the intake process, the SCC obtains more detailed information about the individual's financial

---

[3] During calendar year 2019, there were 6,833 bankruptcy cases filed by all filers in the District of South Carolina.

circumstances, including researching asset values and obtaining spousal and employment information.  The SCC also relays scripted disclosures that discuss the basic differences between the bankruptcy chapters and available bankruptcy alternatives.  A bankruptcy chapter is "preliminarily selected" by the individual and noted in Upright's records.  The SCC also gives contact information the individual can provide creditors to confirm he has retained Upright for debt relief services, even though no bankruptcy petition has been filed.

6.     At the conclusion of the intake process, the SCC discusses a payment plan for Upright's fees, which must be paid before any bankruptcy petition is filed.  Once the payment plan is set, the telephone call typically ends.

7.     The SCC then reviews the information provided, which forms the case file. The SCC submits the case file to an "onboarding attorney" located in Chicago.  The onboarding attorney reviews the information gathered by the SCC to ensure it is complete and accurate and preliminarily approves the case file.  There was no evidence that the onboarding attorney is ever a SC attorney.

8.     The case is then assigned to a "local partner" in the state where the individual resides.  If there is more than one local partner in a state, cases are assigned on rotation based on the partner's geographical location in relation to the individual.

9.     The onboarding attorney's preliminary approval generates a notification email to that local partner.  The notification includes the intake information and requests the local partner complete a "compliance call" with the individual to confirm the information acquired during the intake, determine whether the bankruptcy chapter preliminarily selected is likely to meet the individual's objectives, set proper expectations, inform the individual of documents and information to gather in preparation for filing, answer any questions, and

conduct a conflict check.  At the conclusion of the compliance call, the local partner may

approve or reject the assignment.

10.     A local partner is someone who signed a Partnership Agreement with Upright

and agreed to act with Upright and provide bankruptcy services to Upright's clients.  The

Partnership Agreement provides, in relevant part:

> This Agreement shall govern the relationship between the Firm and Partner on
> what is anticipated to be a series of legal matters to resolve Client's financial
> hardship and/or to protect Client's rights under various state and federal
> consumer protection statutes (each, a "**Case**").  Partner, upon execution of this
> Agreement, will be deemed to be serving as a non-equity, non-voting
> Partner/Member of the Firm, and agrees to serve as a Partner of the Firm as
> further described below.  Partner shall perform Certain Responsibilities of
> Partner (as described in section 3 below) on each Case assigned to Partner in
> the Firm's case management database (the "**Database**"); provided, that Partner
> may, by providing written or electronic notice to Firm, decline representation
> on any Case.
>
> . . . .
>
> **2.  Responsibilities of Firm.** Firm shall be the initial point of contact for all
> new Client calls, shall (i) schedule and confirm retention appointments, (ii)
> prepare intake forms, disclaimers and agreements for Clients to sign at a
> retention meeting, (iii) field all Client calls and creditor/opposing counsel calls,
> (iv) collect/process all Client payments, including fee payments and costs to
> be paid out of each Client's trust account.  Client calls shall be forwarded to
> Partner in the event that any such Client requires legal advice, Client's inquiry
> requires speaking directly with Partner or Client otherwise indicates their need
> to speak with their attorney.  Client calls not requiring legal advice, not
> otherwise requiring the Client speak with Partner, will be handled by a Firm
> legal assistant, staff Partner, attorney or other legal professional, unless Client
> otherwise specifically requests speaking directly with Partner.  Opposing
> counsel/creditor calls shall be forwarded to Partner in the event that the nature
> of the call necessitates direct communication with Partner or is in relation to a
> legal matter set on the court's calendar for which direct communication among
> counsel is necessitated . . . Firm and Partner shall each have discretion in (i)
> determining whether or not to accept or represent any Client . . . In order that
> Firm and Partner are able to consistently comply with Bankruptcy Code section
> 528, requiring that "not later than 5 business days after the first date on which
> such agency provides any bankruptcy assistance services to an assisted person,
> but prior to such assisted person's petition under this title being filed, execute
> a written contract . . .", Partner hereby specifically authorizes Firm to affix
> Partner's electronic signature to the Firm's retainer agreement for the purposes
> of issuing an executed retainer agreement.  Per the terms of the retainer, Partner

shall still have full discretion to rescind the retainer agreement if, upon direct consultation with Client, Partner determines for any reason that s/he is unwilling to represent the Client under the terms currently offered in the agreement, at which time, Firm shall either refund one hundred percent (100%) of fees paid by Client per its "no questions asked" refund policy or reissue a new retainer acceptable in all respects to both Client and Partner.

### 3. Certain Responsibilities of Partner.

A) *Notice of Partnership/Affiliation, Conflicts* . . . Immediately upon being notified of an appointment with a potential Client, Partner will cross-check against any Other Firm's[4] database to identify any conflicts of interest which might interfere with Partner's or Firm's representation of such Client and will immediately notify Firm of any such conflict. Furthermore, Partner will update each Other Firm's database to disclose the Firm's potential representation and avoid any future conflict. Finally, Partner shall notify Firm before initiating any partnership or other affiliation with any additional firms.

B) *Availability for Consultations.* Partner will make him/herself regularly available for new Client consultations for no less than is necessary to perform an initial review call with each client within forty-eight (48) hours of being notified that a new client has been assigned to Partner. Further, Partner will notify Firm in the event that Partner cannot reach Client to perform the review call after making at least two attempts within such forty-eight (48) hour period . . . Partner may request, but not require, that Client travel to Partner's office for an in-person consultation. Partner may only require an in-person meeting if, in Partner's reasonable judgment, an in-person meeting is required to meet Partner's responsibilities under the Rules of Professional Conduct or the U.S. Bankruptcy Code. Partner must make him/herself available for an in-office consult upon the request of the client.

. . . .

E) *Responsibility.* Partner will, throughout the duration of each Case, regularly inform the Firm of strategic and planning decisions. Notwithstanding the foregoing, the Attorneys will have joint responsibility for representation of the Client in respect of each Case and as such, each of the Attorneys will share the preparation and presentation of each case . . .

F) *Payment of Fees.* Partner shall not collect payments directly from a Client in advance of filing a Chapter 7 bankruptcy case or not at all in a Chapter 13 case, and in such case Partner agrees to forward all such retainers to Firm headquarters . . .

. . . .

I) *Consultation.* Within forty-eight (48) hours of being assigned a Client, Partner shall review the documents provided by Firm to Partner related to Client's case, objectively present to Client, by telephone, the debt relief

---

[4] "Other Firm" is not a defined term in the Partnership Agreement.

alternatives as outlined in such materials or those that Partner believes are most appropriate for Client. Subsequent to the initial consultation, Partner will make him/herself available to consult/advise client in relation to all matters related to Case, including but not limited to responding to creditor litigation, exploring alternative remedies and prosecuting/defending related claims. Additionally, Partner shall, on no less than a weekly basis, review the progress of Client's matter including the ongoing progress/feasibility of Client's elected debt relief assistance.

. . . .

K)  *Work after Payment in Full.*  After Client has fulfilled all pre-petition payment obligations, Partner is primarily responsible for all work related to collecting documents, preparing and filing a bankruptcy petition and plan, fulfilling all trustee document requests, preparing clients for hearings, appearing at all hearings and all other work required by the court to successfully effectuate a discharge of debt under Chapter 7 or Chapter 13.

**4. Allocation of Fees.**

A)  *Earned Fee Allocations* . . .

. . . .

(2) **For a Chapter 13 Bankruptcy**, Firm shall charge, and collect and retain, where permissible, $1500.00 in pre-petition Chapter 13 fees and, unless directed otherwise by Partner, quote the standard "no look" fee accepted per local rules. Partner shall receive (a) one hundred percent (100%) of the Earned Fees distributed post-petition by the Chapter 13 trustee . . . and (b) one hundred percent (100%) of all applicable Earned Fees granted by the Court pursuant to a supplemental fee application for additional post-petition services . . .

. . . .

**25. Partner Interest:** Partner hereby agrees and acknowledges that Partner's status as a Partner does not render Partner an owner or equity holder in Firm. Partner will not be required to make any monetary or other capital contribution to the Firm. Partner's relationship with Firm is created solely and exclusively by this Agreement, and Partner shall not, under any set of circumstances, be deemed to own any interest or have any voting rights within Firm . . .

(emphasis in original).

11.    In Chapter 13 cases, Upright receives all pre-petition fees ($1,500.00 where permissible), except for approximately $50.00 provided to the local partner to cover pre-petition expenses. The local partner receives post-petition fees paid through plan distributions by the Chapter 13 trustee.

12.    The onboarding attorney's preliminary approval of the case file, which happens prior to the individual's consultation with a local partner, generates a retainer agreement for the onboarding attorney to send to the individual.  Although the individual and local partner have not yet spoken, pursuant to the Partnership Agreement, this retainer agreement includes a local partner's digital signature.   The retainer agreement is for bankruptcy services and is specific to the chapter that was preliminarily selected during the intake process.

13.    The Attorney Client Legal Services Agreement for Chapter 13 Bankruptcy ("Retainer Agreement") signed in this case includes the following provisions:

> This Agreement is executed between Upright Law ("Firm") and the undersigned ("Client").  The undersigned Partner of Firm has authorized Firm to affix Partner's digital signature upon this Agreement ("Agreement"). Agreement is subject to Partner's further review and approval after consultation with Client.  Agreement contemplates bankruptcy related services ("Services") ONLY and no other representation.  The Partner will review this Agreement with Client, including which chapter of bankruptcy Client is eligible for.
> . . . .
> Firm will immediately begin providing Services and bill for all Services, including those provided before this Agreement is signed . . . Client has 60 days from Client's final payment of Upfront Fee to turn in all requested documents or, if Firm as to spend additional time collecting documents due to Client's unreasonable delay, Client may be charged an additional Flat Fee of $375.00, and any amounts on deposit with Firm to pay filing fees or other costs will be applied toward that $375.00 Fee.  No Chapter 13 petition will be filed until all Upfront Fees and costs are paid in full and Client provides all documents.
> . . . .
> Client authorizes Firm to adjust debts at Client's direction to fully pay the Upfront Fee.  Client may cancel future payments only by written notice at least five days in advance.
> . . . .
> Firm represents Client primarily through means of telephonic and online communication via email, phone or computer-based virtual meeting room, and not face-to-face at a physical office.  Client has elected to use Firm, in part, because Client finds this service to be more efficient and convenient.  Client

has the right to meet with Partner in person at a mutually agreeable time and
location.

. . . .

If Client cancels, Client will be charged for all Services up to the date of
cancellation.  Firm will provide an accounting along with any unearned portion
of the Fee.

15.     The Retainer Agreement explains that if the individual cancels, he "would be
charged for all services provided up to the date of cancellation" and Upright would provide
an accounting along with any unearned portion of the fee.

16.     The Retainer Agreement also includes a cover page[5] that states the following:

✓  **We fight for you.**  Once you sign, we will work tirelessly and fight for
   *your rights* to get you on the path to financial freedom.

✓  **We start work immediately.**  We will start by *immediately* taking your
   creditor calls and preparing your case.  As soon as your payment plan is
   completed, we will get you filed for bankruptcy.

✓  **We have no hidden fees.**  This retainer confirms the attorney fees you
   discussed earlier with us.  There are no hidden extra charges.  If anything
   in your circumstances does change, we will always discuss with you.

. . . .

   **Please sign and return this retainer agreement as soon as possible so we
   can start work on your case without delay!**

(emphasis in original).  The cover page is signed by Kevin Chern as Upright's Managing
Partner.[6]  Mr. Chern is not a SC attorney.

14.     Despite the appearance of a local partner's electronic signature on a Retainer
Agreement, it specifies that the individual hired the firm – not a particular attorney – and the
firm will immediately begin providing services and accrue billable time.  The local partners
and representative of Upright testified that they consider the individual to be a client of only
the firm and no specific attorney.  They do not consider the individual to be a client of the

---

[5] The cover page is titled "Retainer Agreement," but for ease of reference will be referred to herein as the "cover page."
[6] After this case was filed, ownership of Upright changed and Chern is no longer affiliated with the firm.

local partner until the partner completes the compliance call and agrees to accept the assignment.

15.      The only evidence of conflict checks performed by Upright during the intake process includes running through Upright's database the individual's name and any creditors the individual can provide during the intake process.  There was no evidence of a thorough conflict check at Upright involving the entities on the individual's full credit report or ultimately his creditor list.  A conflict check is also conducted by the local partner prior to the compliance call to compare the names provided to Upright during the intake process to that local partner's firm or personal database.  It is within the local partner's discretion/obligation to run another conflict check once he obtains the individual's full credit report.  There was no indication of a mechanism employed to compare conflicts among the numerous local partners' databases.

## B. THE WALKERS' EXPERIENCE WITH UPRIGHT

1.      In June 2018, Mr. Walker was unemployed and the Walkers anticipated a foreclosure proceeding involving their home.  Mr. Walker researched debt relief options online and discovered Upright's website.  He was interested in Upright's services because the firm offered a free consultation and assistance without requiring a down payment.  Although Upright's website discloses the initial consultation is conducted by an SCC, Mr. Walker believed it would be provided by an attorney.

2.      On June 18, 2018, Mr. Walker called the telephone number listed on Upright's website seeking more information.  He spoke with Lyanna Harris, an SCC who conducted the initial consultation.  Ms. Harris informed him that she was not an attorney and could not provide legal advice.  Nevertheless, it was determined during this conversation that Mr.

Walker and his wife, who was not on the call, would elect bankruptcy and specifically Chapter 13 relief.  Mr. Walker told Ms. Harris that he wished to retain certain assets and agreed to the representation and fees associated with such relief.

3.      Ms. Harris informed Mr. Walker that before Upright could be retained, he must execute a Retainer Agreement and provide a down payment of $1,860.00[7] before a bankruptcy petition would be filed (the "Upfront Fee").  As a result, Mr. Walker agreed to pay $50.00 toward the Upfront Fee and enter a payment plan for the remainder.  The payment plan provided for automatic drafts from his bank account by Upright, which would pay the balance of Upfront Fee by August 25, 2018.  Payments were drafted by Upright on June 25, 2018, and July 25, 2018.

4.      During the initial consultation, Mr. Walker asked for the contact information for his attorney.  Instead, Ms. Harris informed him that his attorney would be in contact shortly and provided a telephone number to give creditors and a website for information regarding his case file.  Ms. Harris assured Mr. Walker that he would be taken care of because Upright would be able to handle his issues once the Retainer Agreement was signed.

5.      After the initial consultation, Mr. Walker was provided a Retainer Agreement for representation of he and his wife for a Chapter 13 bankruptcy for a total of $4,010.00, including filing fees. The Retainer Agreement specified that the Walkers were to pay the Upfront Fee before their bankruptcy petition would be filed and the remainder would be paid through Chapter 13 plan payments distributed by the bankruptcy trustee.

6.      The Walkers reviewed and electronically signed the Retainer Agreement on June 18, 2018.  The Retainer Agreement also included the electronic signature of local partner

---

[7] Of this amount, $1,550.00 was for attorney's fees and $310.00 was for the Chapter 13 filing fee.

Rick Richardson, a SC attorney located in Prosperity assigned to the case by Upright. At the time the Retainer Agreement was signed, the Walkers had not spoken with a SC attorney. At no time during the intake procedure did any attorney or representative of Upright speak with Ms. Walker.

7.      On June 20, 2018, Ms. Walker notified one of her creditors, Set Financial, that she was filing bankruptcy and provided Upright's contact information. That same day, a representative of Set Financial contacted Upright and was directed to a website where he was able to verify that Ms. Walker had retained Upright. The website did not provide the name of a specific attorney who represented Ms. Walker as of that date. Upon confirming Upright's retention, Set Financial ceased contact with Ms. Walker.

8.      Although the Retainer Agreement was executed and the case assigned to attorney Richardson, he did not contact the Walkers to conduct the compliance call within the 48-hour timeframe provided in the Partnership Agreement. Mr. Walker left messages for Mr. Richardson that were not returned[8] and contacted Upright to check on the status of his case. After no communication from Mr. Richardson for one week, Upright reassigned the Walkers' case to SC attorney Paul Owen on June 25, 2018.

9.      No new Retainer Agreement was executed when the case was reassigned, even though Mr. Owen also authorized Upright to digitally affix his signature to retainer agreements. Mr. Owen and Mr. Richardson do not share a practice in South Carolina, work in separate towns, and independently represent consumer bankruptcy clients in addition to and outside of their professional relationships with Upright.

---

[8] It is not clear if Mr. Walker obtained Mr. Richardson's contact information on his own or was provided it by Upright.

10.    Although the Walkers signed the Retainer Agreement on June 18, 2018, and Mr. Owen was notified of the case reassignment on June 25, 2018, he did not contact Mr. Walker until July 2, 2018.

11.    During the July 2, 2018, compliance call with Mr. Walker, Mr. Owen verified the information Mr. Walker provided Upright, obtained additional details regarding the couple's financial information, and discussed the differences between Chapters 7 and 13.  Mr. Owen also informed Mr. Walker that he was located in Orangeburg and invited the Walkers to his office to help prepare for their filing.  Mr. Walker voiced concerns over the distance and travel to Mr. Owen's office (approximately three-hours roundtrip).

12.    At the conclusion of the compliance call, Mr. Owen determined the Walkers were appropriate candidates for Chapter 13 and approved the assignment.  Although Mr. Owen spoke with Mr. Walker a couple more times, he never spoke with Ms. Walker.

13.    Mr. Walker contacted Upright on August 14, 2018, to terminate their relationship.  Mr. Walker wished to retain bankruptcy counsel elsewhere because he did not believe Upright adequately represented him since it took several weeks before he communicated with a SC attorney and his assigned local partner was several hours away from his residence.

14.    That same day, Mr. Walker requested a refund of the $1,290.00 paid toward the Upfront Fee thus far by deductions from his bank account.  Upright paused the payment plan and informed Mr. Walker that his request may take ten days to process.

15.    On August 22, 2018, a representative of Upright informed Mr. Walker that he would receive a partial refund due to time spent by Upright working on the case.  Upright stated, "[s]ome of that time may have been administrative in nature, for example, opening

your file, setting up payments, fielding calls, corresponding with you, processing your

cancellation request; and some may have been legal in nature, for example, speaking with

attorneys, doing legal analysis." Upright provided an accounting of the services rendered,

which indicated it had billed $776.50 in fees.

16.     Galloway testified that because the firm typically charges a flat fee for services,

the accountings are not contemporaneous time records, the time increments are standard times

charged by Upright and are not representative of the actual time spent by the individual on the

corresponding task, and most of the time entries are estimates of the actual time spent.

17.     Despite the joint Retainer Agreement, the accounting states it is for services

for Mr. Walker and does not reference Ms. Walker.  It includes fees incurred for various

clerical tasks billed by staff, associates, and a partner of Upright, without providing any

identifying information for the timekeeper.  The time entries are as follows:

| Date | Activity Name | Time (Staff) | Time (Associate) | Time (Partner) | Hourly Rate | Amount Earned |
|---|---|---|---|---|---|---|
| 6/18/2018 | Added new contact | 0.1 | | | $125.00 | $12.50 |
| 6/18/2018 | Added new form of payment | 0.1 | | | $125.00 | $12.50 |
| 6/18/2018 | Created a payment plan | 0.1 | | | $125.00 | $12.50 |
| 6/18/2018 | Submitted case file for attorney review | 0.5 | | | $125.00 | $62.50 |
| 6/18/2018 | Updated case file information | | 0.1 | | $250.00 | $25.00 |
| 6/18/2018 | Reviewed and approved case (associate) | | 0.3 | | $250.00 | $75.00 |
| 6/18/2018 | Update case file information | | 0.1 | | $250.00 | $25.00 |
| 6/18/2018 | Sent retention agreement to client | | 0.1 | | $250.00 | $25.00 |
| 6/18/2018 | Updated case file information | | 0.1 | | $250.00 | $25.00 |
| 6/18/2018 | Updated contact | | 0.1 | | $250.00 | $25.00 |
| 6/18/2018 | Sent retention agreement to client | | 0.1 | | $250.00 | $25.00 |
| 6/18/2018 | Updated case file information | | 0.1 | | $250.00 | $25.00 |

| 6/18/2018 | Reassigned case file to new partner | | 0.1 | | $250.00 | $25.00 |
|---|---|---|---|---|---|---|
| 6/20/2018 | General | 0.1 | | | $125.00 | $12.50 |
| 6/20/2018 | Other | 0.1 | | | $125.00 | $12.50 |
| 6/25/2018 | Reassigned case file to new partner | | 0.1 | | $250.00 | $25.00 |
| 6/25/2018 | General bankruptcy information | | 0.1 | | $250.00 | $25.00 |
| 7/2/18 | General | 0.1 | | | $125.00 | $12.50 |
| 7/2/2018 | General bankruptcy information | 0.1 | | | $125.00 | $12.50 |
| 7/2/2018 | General bankruptcy information | 0.1 | | | $125.00 | $12.50 |
| 7/2/2018 | Reviewed and approved case (partner) | | | 0.7 | $395.00 | $276.50 |
| 8/14/2018 | Paused payment plan | 0.1 | | | $125.00 | $12.50 |
| | | | | | | **$776.50** |

18.     The fees billed include charges for Mr. Walker's calls with Upright, including phone calls to check on the status of his case when he had not heard from the local partner, charges for reassignment of his case due to Upright's lack of contact, and for tasks related to billing and collection procedures.

19.     Upright agreed to discount this amount by $250.00 for one hour of "associate time" and refund the Walkers $763.50 of the $1,290.00 paid.  The term "associate" means an onboarding attorney or other attorney at Upright's Chicago office.  Upright told Mr. Walker the refund could take up to thirty days.

20.     Mr. Walker contacted Upright several times in September and October 2018 to check on the status of his refund.  On October 2, 2018, he was informed by Kathleen Hohe, a Senior Client Services Executive, that there was a delay in issuing the refund because Upright no longer represented clients in North Carolina and Montana and had to first issue refunds for those clients.  Mr. Walker was told his refund could take up to 45 business days.

21.     The Walkers eventually received a refund of $763.50 in October 2018.  Upright retained $526.50.

### C. BANKRUPTCY AND PROCEDURAL HISTORY

1.      Prior to the partial refund, the Walkers hired F. Lee O'Steen of Rock Hill as

bankruptcy counsel and filed a petition for Chapter 13 relief on August 29, 2018.  This

adversary was filed on October 10, 2018, asserting fraud, breach of contract, and request for

sanctions under § 105 and "other sections of the Bankruptcy Code."

2.      On April 24, 2019, the parties entered a settlement agreement wherein the

Walkers dismissed the claims for fraud and breach of contract in exchange for a refund of the

amount Upright had retained.[9]

3.      Pursuant to the Stipulation of Dismissal, "[e]ach side shall bear their own costs

and fees, including all attorney fees."  The attached Settlement Agreement and Release stated,

in relevant part:

> WHEREAS, the WALKERS have asserted claims (the "Claims") against
> [Upright] related to [Upright's] representation of the WALKERS in connection
> with bankruptcy asserted in Adversary Proceeding, Walker v. UpRight Law et
> al., 7:18-ap-80075;
>
> WHEREAS, the aforementioned claims asserted by the WALKERS included
> allegations that [Upright] committed unauthorized practice of law, breach of
> contract and fraud;
> . . . .
> Release. Conditioned on receipt of the payment . . . the WALKERS hereby
> release and forever discharge [Upright] . . . from any and all debts, claims,
> demands, damages, losses, liabilities, rights, actions, causes of action,
> expenses, contracts, promises, awards, and suits of any kind whatsoever . . .
> related to the Claims . . .  The WALKERS do not agree to compromise their
> request for sanctions under 11 U.S.C. § 105.  [Upright] reserves its rights to
> contest the request for sanctions under 11 U.S.C. § 105 and may assert that the
> WALKERS do not have standing to request sanctions under 11 U.S.C. § 105.
> . . . .
> Costs and Attorney's Fees. The WALKERS and [Upright] shall be responsible
> any pay all their own costs, attorney fees and expenses incurred by each of
> them in connection with this Agreement and the Claims.

---

[9] *See* ECF. No. 32.

3.      After the Court denied Upright's motion for summary judgment on the

sanctions claim,[10] Upright moved to withdraw the reference to this Court and transfer the case

to the United States District Court for the District of South Carolina for a jury trial.  Upright

asserted the remaining dispute was essentially a § 105 claim related to alleged pre-petition

professional malpractice – not relief based on any alleged violation of the Bankruptcy Code –

which was more appropriate for trial before the district court.[11]  The Walkers' response argued

that because only their claim under § 105 remained, the Court had the statutory and inherent

authority to review Upright's conduct and issue any appropriate sanctions, which is a core

proceeding under 28 U.S.C. § 157(b)(2).[12]

4.      On October 3, 2019, the district court issued an order finding the remaining

equitable claim for sanctions under § 105 was properly before this Court.[13]  It reasoned, in

part, that although not specifically enumerated in 28 U.S.C. § 157(b)(2), this matter was a core

proceeding because the Walkers' § 105 claim seeks equitable relief arising out of Upright's

pre-petition representation in a potential bankruptcy proceeding and this Court has the

independent authority to monitor and review the conduct of parties that appear before it and

issue sanctions when appropriate.  The district court also reasoned that resolution of the case

in this Court contributes to the uniform administration of bankruptcy proceedings since it

involves Upright's conduct related to legal services for a Chapter 13 case and prevents

---

[10] ECF No. 40, entered Jun. 21, 2019.
[11] ECF No. 47, filed Jul. 12, 2019.
[12] ECF No. 51, filed Jul. 17, 2019.  The Complaint is vague and only cites § 105 as grounds for relief.  The Walkers later asserted in their objections to Upright's dispositive motions and the Joint Pretrial Order that Upright violated §§ 329 and 526. (ECF Nos. 13, 38, & 46).  However, in the subsequent withdrawal of reference proceeding, the Walkers did not mention any claim for relief for violations of §§ 329 or 526 and advocated for continued reference of the matter to this Court because it is only a § 105 issue. (ECF No. 51).
[13] ECF No. 57.  The district court explained that the factors for permissive withdrawal weighed in favor of this Court retaining jurisdiction.

potential forum shopping, which the district court believed was the primary motivating factor behind Upright's motion for withdrawal of the reference.

5.  With this direction regarding the Court's task in this case, the matter was returned to the bankruptcy court for trial of the remaining issues.

6.  The trial was held on December 20, 2019.  At trial, Upright's attempts to call into question Mr. Walker's credibility and Mr. O'Steen's intentions in filing this adversary proceeding were not persuasive.[14]  The Court found Mr. Walker a credible and sincere witness and nothing in the record supports a finding that this proceeding was inappropriately pursued.

### D. CONCLUSIONS REGARDING UPRIGHT'S PRACTICES AND PROCEDURES

1.  Upright provided information about bankruptcy relief and the differences between Chapters 7 and 13 to a South Carolina resident through a person that was not a SC attorney, and that resident and his spouse made decisions based on the advice.

2.  A Retainer Agreement, forming an attorney/client relationship, was executed based on conversations with and information provided by a person and/or persons who were not under the control or supervision of a SC attorney.

3.  Upright "signed" the name of a SC attorney to a Retainer Agreement, but that attorney was not involved in the formation of the attorney/client relationship and was never involved in the clients' case.

4.  Fees were collected from the clients' bank account before consultation with a SC attorney.

5.  No SC attorney spoke with clients for two weeks after the Retainer Agreement was executed, and never spoke to one client subject to the Retainer Agreement.

---

[14] *See* ECF No. 75 at p. 1, 7-9; Exs. J-N.

6.      Upright advised at least one creditor that it represented a client before any SC attorney was consulted or had counseled the clients.

7.      Upon termination of the attorney/client relationship, the clients were billed by Upright for tasks performed by non-attorney staff, tasks that appear unnecessary, tasks that did not actually occur, that were for clerical purposes such as billing and reassigning cases, and for duplicate time entries.

8.      Upright did not promptly refund amounts to the clients upon termination of the attorney/client relationship.

9.      An adversary proceeding and the jurisdiction of this Court were required before Upright issued a refund to clients of all amounts due.

10.     To receive the refund, clients had to agree to releases and to be responsible for their attorney's fees and costs incurred in the pursuit of that refund.

11.     Adequate procedures are not in place to ensure Upright and its local partners are free from conflicts of interest, including whether any conflicts exist among the local partners or between Upright and local partners not assigned to the client in question.

## II.    APPLICABLE AUTHORITIES

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(a) and 1334(b), and pursuant to the district court's order returning the matter to this Court. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

Bankruptcy courts, like Article III courts, have an inherent power to impose sanctions against parties or attorneys that appear or practice before it. This power is derived from the court's need to "manage its own affairs so as to achieve the orderly and expeditious disposition

of cases," and includes "the power to control admission to its bar and to discipline attorneys who appear before it." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43, 111 S. Ct. 2123, 2132, 115 L. Ed. 2d 27 (1991) (quoting *Link v. Wabash R.R. Co.,* 370 U.S. 626, 630-31 (1962)). "The federal courts may and should hold attorneys appearing before them to recognized standards of conduct in their jurisdictions: 'The sanctioning court must, however, hold attorneys accountable to recognized standards of professional conduct.'" *In re Computer Dynamics, Inc.*, 252 B.R. 50, 64 (Bankr. E.D. Va. 1997), *aff'd,* No. 98-1793, 1999 WL 350943 (4th Cir. Jun. 1, 1999) (quoting *In re Finkelstein,* 901 F.2d 1560, 1564 (11th Cir. 1990)).  In most cases, before the Court may use its inherent powers to issue sanctions, it must first find that the party or counsel acted in bad faith. *See Chambers*, 501 U.S. at 50, 11 S. Ct. at 2135.

Section 105(a) also specifically grants bankruptcy courts the power to "issue any order . . . necessary or appropriate to carry out the provisions of this title." It states that "[n]o provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, *sua sponte*, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process." 11 U.S.C. § 105(a).  Bankruptcy courts have "broad authority" under § 105(a). *See Marrama v. Citizens Bank of Mass.* 549 U.S. 365, 375, 127 S. Ct. 1105, 166 L.Ed.2d 956 (2007).   However, they may not use § 105(a) or their inherent authority to issue sanctions that contradict or override explicit mandates of other sections of the Bankruptcy Code. *Law v. Siegel,* 571 U.S. 415, 421, 428, 134 S. Ct. 1188, 1194-95, 1198, 188 L. Ed. 2d 146 (2014).

"[T]he Bankruptcy Code, both in general structure and in specific provisions, authorizes bankruptcy courts to prevent the use of the bankruptcy process to achieve illicit

objectives." *In re Kestell*, 99 F.3d 146, 149 (4th Cir. 1996); *see also In re Chicora Life Ctr., LC*, 553 B.R. 61, 67 (Bankr. D.S.C. 2016) ("The provisions of the Bankruptcy Code, including the equitable powers of the bankruptcy court under § 105, are designed to protect the public interest." (citing *Fisher v. Apostolou*, 155 F.3d 876, 882 (7th Cir. 1998))).  To that end, § 105(a) has been interpreted to instill bankruptcy courts with the civil contempt power. *See In re Walters,* 868 F.2d 665, 669 (4th Cir. 1989) (affirming the bankruptcy court's order holding in contempt an attorney who failed to comply with an order to refund unapproved attorney's fees).  Thus, "[b]ankruptcy courts have inherent and statutory power to police the conduct of the parties who appear before them and to impose sanctions on those parties who abuse the judicial process." *In re Banner*, C/A No. 15-31761, 2016 WL 3251886, at *7 (Bankr. W.D.N.C. June 2, 2016) (quotation marks and citation omitted).  Federal courts, including bankruptcy courts, expect attorneys to comply with the state rules of professional conduct and may use their sanctioning authorities for any such violations.

The Court reviewed and considered provisions of the Bankruptcy Code and Bankruptcy Rules raised by the Walkers at certain points in this adversary proceeding. *See* 11 U.S.C. §§ 329 & 526; Fed. R. Bankr. P. 2017.  It also reviewed and considered other provisions of the Bankruptcy Code and Rules as well as other authorities governing attorneys permitted to appear before this Court and a myriad of South Carolina Rules of Professional Conduct not previously raised. *See* 11 U.S.C. §§ 527 & 528; Fed. R. Bankr. P. 9011; Local Civ. Rule 83.I.08 (D.S.C.), RDE Rule IV(B); Rules 1.4, RPC, Rule 407, SCACR (Communication), 1.5 (Fees), 1.7 (Conflict of Interest: Current Clients), 1.9 (Duties to Former Clients), 1.10 (Imputation of Conflicts of Interest: General Rule), 1.16 (Declining or Terminating Representation), 5.1 (Responsibilities of Partners, Managers, and Supervisory

Lawyers), 5.3 (Responsibilities Regarding Non Lawyer Assistance), and 5.5 (Unauthorized Practice of Law; Multijurisdictional Practice of Law).

### III.   ANALYSIS

#### A. SANCTIONS IN THE FORM OF ATTORNEY'S FEES, COSTS AND ADDITIONAL DAMAGES PURSUANT TO § 105(A)

Even if the Court found Upright's pre-petition conduct toward the Walkers and its failure to promptly and accurately issue a refund are bad faith warranting a sanction to benefit the Walkers, the prior settlement terms include a release and provide the parties are responsible for their own attorney's fees and costs in connection with "the Claims" asserted in this adversary proceeding.  Additionally, the pleadings regarding withdrawal of reference and the district court's order returning the matter to this Court define the remaining issues as a matter involving this Court's review of the conduct of the parties appearing before it, not an action to impose sanctions in the form of attorney's fees and damages to benefit one party. These facts lead the Court to conclude that this is not an instance where it should exercise its discretion under § 105(a) to impose monetary sanctions for attorney's fees, costs, or other alleged damages to compensate or for the benefit of the Walkers.[15]

#### B. OTHER RELIEF UNDER § 105(A)

The foregoing does not negate the Court's ability to scrutinize the conduct of the parties and attorneys that appear before it to prevent an abuse of process.  Upright filed approximately 865 bankruptcy cases in South Carolina in 2019 and continues to advertise its services to potential clients in this state.  The impact of Upright's practices and procedures on this Court is greater because this number excludes individuals, like the Walkers, who did not

---

[15] The Court notes that nothing in this Order prevents O'Steen from requesting reimbursement from the Walkers through their Chapter 13 plan for the attorney's fees and costs incurred in this adversary proceeding pursuant to any fee agreement.

ultimately file bankruptcy with Upright as counsel.  Focusing on the factual conclusions regarding Upright's practice before the Court in Section I(D) above, the Court exercises its discretion pursuant to § 105(a) to review Upright's compliance with applicable authorities to prevent any abuse of process.  Because this matter was initially presented to the Court as a two-party dispute and the Court's review may involve authorities implicated but not specifically pled in the Complaint, out of an abundance of caution, Upright is granted an opportunity to respond prior to any further Order or action by the Court.

**IT IS, HEREBY, ORDERED** that the Walkers' request for an award of monetary sanctions against Upright and for their benefit is denied.

**IT IS FURTHER ORDERED** that, pursuant to § 105(a), on or before **April 10, 2020,** Upright shall: review Section I(D) (Conclusions 1-11) herein and file a Response detailing any dispute with those findings; and review Local Civ. Rule 83.I.08 (D.S.C.), RDE Rule IV(B); 11 U.S.C. §§ 329, 526, 527, and 528; Fed. R. Bankr. P. 2017 and 9011; Rules 1.4, RPC, Rule 407, SCACR (Communication), 1.5 (Fees), 1.7 (Conflict of Interest: Current Clients), 1.9 (Duties to Former Clients), 1.10 (Imputation of Conflicts of Interest: General Rule), 1.16 (Declining or Terminating Representation), 5.1 (Responsibilities of Partners, Managers, and Supervisory Lawyers), 5.3 (Responsibilities Regarding Non Lawyer Assistance), and 5.5 (Unauthorized Practice of Law; Multijurisdictional Practice of Law), and detail in the Response any arguments to support the compatibility of the findings in Section I(D) (Conclusions 1-11) with those authorities.

**TAKE NOTICE** that any further action, if found to be appropriate after a review of the Response, may include monetary and non-monetary sanctions, and/or referral of any

relevant matters to South Carolina Office of Disciplinary Counsel and/or the U.S. District

Court pursuant to Local Civ. Rule 83.I.08 (D.S.C.), RDE Rule V.

**AND IT IS SO ORDERED.**

**FILED BY THE COURT**
**02/20/2020**



US Bankruptcy Judge
District of South Carolina

Entered: 02/20/2020